884 F.2d 1064
 58 USLW 2172, Prod.Liab.Rep.(CCH)P 12,250
 Connie HILL, William Hill, Appellants,
v.
SEARLE LABORATORIES, A DIVISION OF SEARLE PHARMACEUTICALS,
INC., G.D. Searle & Company and Searle & Company, Appellees,
John Doe I and John Doe II.
 No. 88-1933.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1989.
Decided Aug. 30, 1989.
Rehearing and Rehearing En Banc Denied Nov. 9, 1989.
 
 David Hodges, Little Rock, Ark., for appellants.
 Elizabeth J. Robben, Little Rock, Ark., for appellees.
 Before MAGILL and BEAM, Circuit Judges, and HEANEY, Senior Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 In 1981, a Searle-manufactured copper intrauterine device (IUD), a CU-7, was implanted in Connie Hill. Three years later, she gave birth to a child. The next day, she had tubal ligation surgery. During this surgery, it was discovered that the CU-7 had perforated Hill's uterus and was partially embedded in her small bowel. Hill and her husband then brought suit against Searle. After six months of discovery, Searle requested and was granted summary judgment. 686 F.Supp. 720. The district court reasoned that the CU-7 was a prescription drug product falling within the scope of comment k of section 402A of the Restatement of Torts. She further reasoned that the learned intermediary rule applied to prescription drugs in general and to CU-7s in particular and that, because Hill's doctor had been given an adequate warning of the danger of perforation, Hill could not recover. Hill appeals. We reverse and remand because, in our view, Hill was entitled to be personally warned and there is a dispute in the record as to whether that occurred.
 
 I. BACKGROUND
 
 2
 The CU-7, being made of copper, a possibly reactive chemical, is a prescription drug product. IUDs gained wide acceptance in the United States in the early 1970s when adverse publicity caused an estimated one million women to cease using oral contraceptives. Statement of Russel J. Thomsen, M.D., Hearings on Intrauterine Contraceptive Devices Before a Subcomm. of the House Comm. on Government Operations, 93d Cong., 1st Sess. (1973). The CU-7 was approved by the Food and Drug Administration (FDA) under its standard of "safety and efficacy."[1] The FDA also approved the contents of the package inserts and labeling that accompanied the CU-7, and the patient brochure. In 1977, the FDA promulgated new labeling requirements for use with all IUDs. 21 C.F.R. Sec. 310.502(b).
 
 
 3
 Dr. Davidson, who treated Hill, was fully aware of the risk of perforation associated with the use of a CU-7 or any IUD. Dr. Davidson was also familiar with the contents of the product literature accompanying the CU-7 and believed that it adequately informed physicians of the potential risks associated with the use of the CU-7. Dr. Davidson's opinion was seconded by Dr. Reynolds, the physician who removed the CU-7 from Hill. As to whether Hill, herself, received a warning, the evidence in the record reveals the following: (1) Dr. Davidson stated that it was his policy to discuss the risks involved with the use of an IUD with every patient but that he could not remember whether this discussion had taken place with Hill; (2) Hill stated that she never received the CU-7's patient brochure and that she received no warnings as to the risks involved with the CU-7; and (3) Hill signed a Batesville Health Department's informed consent form. Searle conceded at oral argument that there is a genuine dispute as to whether Hill received warning.
 
 
 4
 On the basis of the facts stated above, Searle moved for summary judgment. The trial court held that Arkansas courts, if faced with this issue, would adopt comment k to section 402A of the Restatement (Second) of Torts.[2] The district court also determined that the CU-7 fell within the scope of comment k, because all prescription drug products fall within the scope of that comment,[3] and that Searle had met its duty to Hill, under the asserted theories of strict liability, negligence, and breach of warranty, by warning Hill's treating physician.
 
 II. DISCUSSION
 
 5
 The theories of strict liability, the comment k defense to strict liability, negligence and breach of warranty often merge, particularly when it concerns the legal significance of the adequacy of the warnings given. In Arkansas, a supplier of a product is liable under a strict liability theory if: (1) the product is in a defective condition which rendered it unreasonably dangerous, and (2) the defective condition was a proximate cause of the injury.[4] Defective design, defective manufacture or inadequate warning may provide the defective condition required for proof of strict liability.
 
 
 6
 The question of when a product is unreasonably unsafe has occupied a good many writers. The language of the Second Restatement of Torts in dealing with it is that for strict liability the product must be "in a defective condition unreasonably dangerous to the user or consumer or to his property." This terminology may perhaps leave something to be desired, since it is clear that the "defect" need not be a matter of errors in manufacture, and that a product is "defective" when it is properly made according to an unreasonably dangerous design, or when it is not accompanied by adequate instructions and warning of the dangers attending its use.
 
 
 7
 Prosser, Law of Torts, 659 (4th ed. 1971). If a product is found to fall within the scope of comment k of section 402A of the Restatement (Second) of Torts, this defense will negate any finding of defectiveness and unreasonably dangerous condition but only if the product was properly prepared and the supplier properly warned the user. Proper warning is also an element under the theories of negligence and breach of warranty. Haynes v. Am. Motors Corp., 691 F.2d 1268, 1273 (8th Cir.1982) (negligence); Reid v. Eckerds Drugs, Inc., 40 N.C.App. 476, 253 S.E.2d 344 (1979) (breach of warranty). At the time of Searle's motion for summary judgment, whether Searle's warning ever reached Hill became the factual underpinning for recovery.[5]
 
 
 8
 In this case, since the CU-7 carries with it a substantial risk of uterine perforation, a warning as to the risks involved in using the device is clearly required. The question is whether Searle adequately warned Hill, and this question turns on whether a warning to a learned intermediary is sufficient.
 
 
 9
 A. Adoption of Comment K.
 
 
 10
 The district court held that the Arkansas courts, if confronted with this factual situation, would adopt comment k. Hill disputes this holding because the Arkansas legislature did not specifically adopt comment k when it adopted section 402A. Searle argues that comment k is a routinely-followed exception to section 402A and that the Arkansas Supreme Court has often referred to the comments of section 402A, implicitly adopting them. Other jurisdictions which have considered the issue have overwhelmingly adopted comment k. See, e.g. Werner v. Upjohn Co., 628 F.2d 848 (4th Cir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981); Basko v. Sterling Drug, Inc., 416 F.2d 417 (2d Cir.1969); Brown v. Superior Court, 751 P.2d 470 (Cal.1988). We agree with the district court and Searle that the Arkansas courts would join the majority of jurisdictions and adopt the defense to strict liability contained in comment k.
 
 
 11
 B. Is the CU-7 Within the Scope of Comment K?
 
 
 12
 The district court also held that all prescription drugs, including the CU-7, fall within the scope of comment k. Hill argues that this is not necessarily true, that comment k is an affirmative defense and that Searle failed to offer sufficient evidence to support a finding that the CU-7 falls within the scope of comment k.
 
 
 13
 The object of section 402A and strict liability is to shift the cost of an injury to the seller or manufacturer of a defective and unreasonably dangerous product.[6] The intent of the defense in comment k is to preclude certain unavoidably unsafe products from being classified as defective and unreasonably dangerous merely because they are, at the time of manufacture and distribution, incapable of being safe. The underlying policy is that some defective and unreasonably dangerous products benefit society to such an extent that placing the risk of injury on the consumer is justified unless there was negligence in the manufacturing or distribution process or inadequate warning. Thus, the comment k defense is unavailable to products negligently manufactured, negligently distributed or unaccompanied by proper warnings. In this sense, falling within the scope of comment k provides a manufacturer or supplier only a qualified defense from strict liability.
 
 
 14
 We agree with those courts that view comment k as an affirmative defense. Kociemba v. G.D. Searle & Co., 680 F.Supp. 1293, 1301 (D.Minn.1988); Hawkinson v. A.H. Robins Co., Inc., 595 F.Supp. 1290, 1308 (D.Colo.1984); Toner v. Lederle Laboratories, 112 Idaho 328, 732 P.2d 297, 307 (1987). Searle argues that three factors support a finding that the CU-7 is an "unavoidably unsafe" product falling within the scope of comment k: (1) the CU-7 received FDA approval; (2) the CU-7 is a prescription drug product and all prescription drug products fall within the scope of comment k; and (3) uncontradicted expert testimony stated that the CU-7 contains the same risks as any IUD. In our view, Searle's reasoning is insufficient.
 
 
 15
 FDA approval is not a shield to liability. Stromsodt v. Parke-Davis & Co., 257 F.Supp. 991 (D.N.D.1966), aff'd, 411 F.2d 1390 (8th Cir.1969). But see Stewart v. Internat'l Playtex, Inc., 672 F.Supp. 907 (D.S.C.1987). FDA regulations are generally minimal standards of conduct unless Congress intended to preempt common law, which Congress has not done in this area. See, e.g., Brochu v. Ortho Pharmaceutical Corp., 642 F.2d 652, 658 (1st Cir.1981); Salmon v. Parke-Davis & Co., 520 F.2d 1359, 1362 (4th Cir.1975). In addition, FDA approval cuts against a determination that the CU-7 is unavoidably unsafe. FDA approved the CU-7 on two standards: "safety" and "efficacy." 21 C.F.R. Sec. 310.502(b) (an IUD, as a method of contraception, "is generally safe and effective"). Obviously, if FDA regulations declare a drug product to be "generally safe," that declaration is evidence that the drug product is not "unavoidably unsafe."
 
 
 16
 Several courts have concluded that comment k applies to all prescription drug products because of the public interest in the development and availability of reasonably priced prescription drug products. See, e.g., Lindsay v. Ortho Pharmaceutical Corp., 637 F.2d 87 (2nd Cir.1980); Brown v. Superior Court, 751 P.2d 470 (Cal.1988); McKee v. Moore, 648 P.2d 21 (Okl.1982); Terhune v. A.H. Robins Co., 90 Wash.2d 9, 577 P.2d 975, 977-78 (1978). Others have limited the application of comment k to circumstances when it is shown that the product is incapable of being made safe given the present state of human knowledge but possesses such a high degree of social need so that its use is warranted, provided warnings are adequate. See, e.g., Wheelahan v. G.D. Searle & Co., 814 F.2d 655 (4th Cir.1987) (available on WESTLAW);[7] Coursen v. A.H. Robins Co., 764 F.2d 1329, 1337 (9th Cir.1985); Kociemba v. G.D. Searle & Co., 680 F.Supp. 1293, 1301 (D.Minn.1988); Patten v. Lederle Laboratories, 676 F.Supp. 233 (D.Utah 1987); Hawkinson v. A.H. Robins Co., Inc., 595 F.Supp. 1290, 1303 (D.Colo.1984). We agree with the latter view.
 
 
 17
 The drafters of comment k did not intend to grant all manufacturers of prescription drugs a blanket exception to strict liability. Such an exception was proposed at the American Law Institute meeting where section 402A and comment k were adopted, but this proposal was defeated. 38 ALI Proc. 19, 90-98 (1961). The language of comment k suggests that only exceptional products, albeit such exceptional products are more likely to be found in the field of prescription drug products, should be excluded from the strict liability provisions. But more importantly, the example given--the vaccine for the Pasteur treatment of rabies--suggests that only special products, those with exceptional social need, fall within the gamut of comment k.
 
 
 18
 The better reasoned opinions support the view that the unavoidably unsafe exception should only apply upon a showing of exceptional social need. The plain meaning of comment k supports such a view, Toner v. Lederle Laboratories, 112 Idaho 328, 732 P.2d 297, 307 (1987), as does the purpose of comment k. Wheelahan v. G.D. Searle & Co., supra note 7.
 
 
 19
 Furthermore, the premise generally relied on by those courts applying comment k to all prescription drugs--that the public interest in the development of prescription drug products requires the user to bear all the costs of injury unless the drug product was negligently manufactured or designed or unaccompanied by proper warnings--is unconvincing. In our view, this policy has no greater relevance to prescription drug products than to other products having life-saving or life-bettering characteristics.
 
 
 20
 It follows that whether a product is within the scope of comment k should be determined on a case-by-case basis.[8] Toner v. Lederle Laboratories, 732 P.2d at 303-09; Feldman v. Lederle Laboratories, 479 A.2d 374, 382-83 (N.J.1984); Collins v. Eli Lilly Co., 116 Wis.2d 166, 342 N.W.2d 37, 52 (1984), cert. denied, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984).
 
 
 21
 In the case of the CU-7, Searle should bear the risk of injury caused by the CU-7, if the CU-7 is defective and unreasonably dangerous. The reasons are that alternative methods of birth control are available[9] and that Searle has made no showing that CU-7s, or IUDs in general, are exceptionally beneficial to society. Wheelahan v. G.D. Searle & Co., supra note 7. The CU-7 is certainly not the sine qua non for birth control, as is the Pasteur vaccine for the treatment of rabies. Another important factor is that IUD manufacturers, through mass advertising and merchandising practices, generated a general sense of product quality, making it difficult for consumers to fully understand the risks involved with the use of an IUD. Finally, manufacturers were in a better position than the users of IUDs to identify potential risks. By identifying and quantifying these risks, manufacturers could better spread the costs of injuries caused by IUDs to all customers of such products. Thus, Searle's argument that comment k should apply because the use of the CU-7 is no riskier than use of any other IUD is unpersuasive. For these reasons, we feel that the trial court erred in granting summary judgment to Searle on the issue of whether the CU-7 is within the scope of comment k.
 
 C. Learned Intermediary Rule
 
 22
 As a general rule, the manufacturer of a product has a duty to warn the user of dangers inherent in that product under the theories of strict liability, negligence and breach of warranty, and the comment k defense.[10] One of the exceptions to this general proposition is the learned intermediary rule, which assumes that it is reasonable for a manufacturer to rely on the prescribing physician to forward to the patient, who is the ultimate user of the drug products, any warnings regarding their possible side effects. There are several arguments supporting the application of this exception to prescription drug products. First, medical ethics and practice dictate that the doctor must be an intervening and independent party between patient and drug manufacturer. Second, the information regarding risks is often too technical for a patient to make a reasonable choice. Third, it is virtually impossible in many cases for a manufacturer to directly warn each patient.
 
 
 23
 In this case, the trial court held that Searle had fulfilled its duty to warn Hill because it adequately warned the prescribing physician and that is sufficient under the learned intermediary rule. Hill suggests that there is no reason to suspect that the Arkansas courts would apply the learned intermediary rule to the facts of this case. Searle argues that an overwhelming body of law and the realities underlying the administration of the CU-7 dictate the application of the learned intermediary rule.
 
 
 24
 Our view of prescription drugs and the learned intermediary rule is that Arkansas would adopt the test set forth on the issue of adequate warning in Reyes v. Wyeth Laboratories, 498 F.2d 1264 (5th Cir.1974). That court stated that there must be either a warning--meaningful and complete so as to be understood by the recipient--or an individualized medical judgment that this treatment or medication is necessary and desirable for this patient. Id. at 1295.
 
 
 25
 Applying this test to the instant facts, we believe that IUDs, like other forms of birth control, are atypical from most prescription drug products because the treating physician generally does not make an intervening, individualized medical judgment in the birth control decision.[11] Typically, the physician makes the decision of whether a particular treatment is necessary and desirable. In the case of birth control, however, the patient makes an independent decision as to whether she desires a prescription drug for birth control, and if so, which method she prefers, with only limited input from the prescribing physician. Odgers v. Ortho Pharmaceutical Corp., 609 F.Supp. 867, 878 (D.C.Mich.1985). Several factors explain this reversal of roles. First, birth control is a private and personal matter involving a decision that is often dependent on factors to which the physician is not privy. In many cases, the patient makes her choice based on effectiveness, convenience or cost, rather than medical necessity. While a physician may recommend one method over another, the final choice remains that of the woman. Second, Searle marketed the product with the idea of convincing women to choose the CU-7. Furthermore, beyond the initial treatment, there is little to no contact between the physician and the patient regarding the choice and the risks of using IUDs.[12] Finally, IUDs, as with the CU-7 in this case, are given more often than not under clinic-type conditions where physician-patient contact is limited. See Plummer v. Lederle Laboratories, 819 F.2d 349 (2nd Cir.1987) ("If the drug is given under clinic-type conditions, the manufacturer is obliged to warn consumers directly."). Recognizing that these factors limit the role that a physician plays in determining the necessity and desirability of birth control, and the fact that physicians are inundated with information about various prescription drug products,[13] we think that in the case of IUDs, prescribing physicians do not make an individualized medical judgment. Thus, Hill's treating physician was not an intervening party between herself and Searle. It was feasible to warn Hill. Moreover, such warning is required by FDA regulation. Therefore, the trial court erred in applying the learned intermediary rule to the facts of this case.
 
 
 26
 Accordingly, we affirm in part, reverse in part and remand to the district court. On remand, the district court shall determine whether Hill received an adequate warning herself of the risks and hazards attendant to use of the CU-7.
 
 
 27
 MAGILL, Circuit Judge, dissenting.
 
 
 28
 I respectfully dissent. I believe the majority fails to give appropriate weight to two fundamental questions: was the CU-7 device defective (in design or manufacturing) and were Searle's warnings concerning the risk of perforation inadequate? I am not persuaded that the Hills made a showing of any defect. Nor did they establish that Searle failed to give warnings concerning the injury that Mrs. Hill suffered. Therefore, I would affirm the district court's granting of Searle's motion for summary judgment.
 
 
 29
 In The Law of Torts, the chapter on products liability begins as follows:Products liability is the name currently given to the area of the law involving the liability of those who supply goods or products for the use of others to purchasers, users, and bystanders for losses of various kinds resulting from so-called defects in those products.
 
 
 30
 Prosser, William L., The Law of Torts, 677 (1984) (emphasis added).
 
 
 31
 Professor Prosser later defines the term "defect:"
 
 
 32
 A product is defective as marketed in the kind of way that makes it unreasonably dangerous for any of the following reasons: (1) a flaw in the product that was present in the product at the time the defendant sold it [i.e., a manufacturing defect]; (2) a failure by the producer or assembler of a product adequately to warn of a risk or hazard related to the way the product was designed; or (3) defective design.
 
 
 33
 Id. at 695.
 
 
 34
 In light of these elementary principles, I find the majority's conclusion perplexing. The record is devoid of evidence that the interuterine device that injured Mrs. Hill was defective. The majority state that "Searle should bear the risk of injury * * * if the Hills prove that [the CU-7] is defective and unreasonably dangerous," Maj. op. at 1069, but then concludes that the company must bear the loss despite the Hills' failure to identify any defect. In fact, their expert witness (Dr. Reynolds) testified that Searle had done nothing wrong in its manufacturing and distribution of the device. See Appendix, Vol. I, Exhibit E at 000112-13. Dr. Davidson appears to have agreed with that assessment, adding that he considered the CU-7 safe and effective. See id., Exhibit D at 000054.[1]
 
 
 35
 The Hills' arguments that Searle failed to provide adequate warnings are equally uncompelling. Both doctors testified that the labelling and physician warnings were adequate to warn Mrs. Hill's doctors of the risk of perforation. Likewise, they both testified that Searle's patient booklet was adequate to apprise patients of the risk of perforation. The Hills' contention that Searle should have provided warnings directly to Mrs. Hill contravenes clearly established (and nearly universally applied) precedent indicating that a pharmaceutical manufacturer's duty to warn runs only to the prescribing doctor. I see nothing indicating that this doctrine should not apply with full force to all prescription pharmaceutical products, including IUDs.
 
 
 36
 Finally, I disagree with the majority's conclusion that Arkansas would have adopted the "Reyes " warnings test from the Fifth Circuit. I believe Judge Roy reached the correct conclusion in the district court: Arkansas would have applied the learned intermediary rule.
 
 
 37
 In light of the foregoing considerations, I would affirm. Summary judgment for Searle should have been affirmed because the CU-7 was not defective in design or manufacturing and because Searle gave adequate warnings.
 
 
 
 [1]
 In 1974, Searle began marketing the CU-7 in the United States. At that time, FDA considered most IUDs as "medical devices" and did not require premarket testing. The FDA, however, used the authority granted to it under United States v. Bacto-Unidisk, 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969), to define "drug" broadly enough to require premarket testing of medical devices incorporating heavy metals, and subjected the copper-based CU-7 to premarket testing
 
 
 [2]
 Comment k to section 402A provides:
 There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
 
 
 [3]
 The effect of concluding that a particular product falls within the scope of comment k is to provide the manufacturer with a qualified defense to strict liability: If the unavoidably unsafe product was properly prepared and accompanied by adequate warnings, there is no strict liability
 
 
 [4]
 Ark.Code 4-86-102 provides:
 Liability of supplier.
 (a) A supplier of a product is subject to liability in damages for harm to a person or to property if:
 (1) The supplier is engaged in the business of manufacturing, assembling, selling, leasing, or otherwise distributing the product;
 (2) The product was supplied by him in a defective condition which rendered it unreasonably dangerous; and
 (3) The defective condition was a proximate cause of the harm to person or to property.
 (b) The provisions of subsection (a) of this section apply although the claiming party has not obtained the product from or entered into any contractual relation with the supplier.
 
 
 [5]
 Hill alleged that Searle falsified tests to the FDA, that Searle improperly prepared the CU-7, that the directions and warnings given were improper and that Mrs. Hill never received any warning. The district court correctly held that the first three allegations alone were insufficient against a motion for summary judgment but that the final allegation survived under the principles set forth in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Hill supported her fourth allegation that she was never given the warning regarding the risks associated with the CU-7 with her deposition. It may warrant noting that the fact that Hill became pregnant while using the CU-7 is evidence under all three theories alleged by the appellants. Hilliard v. A.H. Robins Co., 148 Cal.App.3d 374, 196 Cal.Rptr. 117, 141 (2 Dist.1983)
 
 
 [6]
 Under Arkansas law, proof for strict liability requires that the product is both defective and unreasonably dangerous. E.I. Du Pont De Nemours & Co. v. Dillaha, 280 Ark. 477, 659 S.W.2d 756 (1983)
 
 
 [7]
 Wheelahan is an unpublished disposition of the Fourth Circuit. The Fourth Circuit disfavors citations to unpublished dispositions, but we find the reasoning of the Fourth Circuit to be highly persuasive. The pertinent part of the opinion states:
 Searle suggests that regardless of our conclusions on bifurcation and adequacy of evidence, we should affirm the judgment because the plaintiffs failed to prove that Searle gave an inadequate warning. Searle invokes Comment K to the Restatement (Second) of Torts Sec. 402A, which provides that an unavoidably unsafe product is neither defective nor unreasonably dangerous if it is properly prepared and is accompanied by proper directions and warnings. Comment K generally applies to prescription drugs, and the Copper 7 has been classified by the Food and Drug Administration as a prescription drug because the copper in it is reactive.
 In Singer v. Sterling Drug Co., 461 F.2d 288 (7th Cir.), cert. denied, 409 U.S. 878, 93 S.Ct. 131, 34 L.Ed.2d 132 (1972), the court rejected the contention that all prescription drugs are automatically excluded from strict liability merely by virtue of being prescription drugs. Other courts have withheld the protection of Comment K from IUDs that are not prescription drugs. See Coursen v. A.H. Robins Co., Inc., 764 F.2d 1329 (9th Cir.1985); Worsham v. A.H. Robins Co., Inc., 734 F.2d 676 (11th Cir.1984).
 The purpose of Comment K is to protect defendants who supply critically needed but potentially harmful products such as human blood or rabies vaccine. Given the broad range of contraceptive alternatives that are available, we strongly doubt that Comment K should in any case apply to the Copper 7. Even if it were applicable, however, Searle offered no evidence that the Copper 7 is unavoidably unsafe. See Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 447 A.2d 539 (1982) (product that has some utility is still not reasonably safe if the same product could have been made or marketed more safely). We therefore reject Searle's alternate grounds for affirmance.
 Wheelahan v. G.D. Searle & Co., 814 F.2d 655 (4th Cir.1987) (available on WESTLAW at pp. 12-13).
 
 
 [8]
 A uniform rule that comment k applies to all prescription drugs is even less coherent considering the history of the IUD. In the early 1970s, when manufacturers began to heavily market the IUD in the United States, most IUDs were not prescription drugs--the CU-7 was an exception because it was manufactured with a heavy metal. If we applied the blanket rule as requested by Searle, the result would be that some IUD manufacturers would be shielded from strict liability but others would not
 
 
 [9]
 Alternative methods of birth control include abstention; coitus interruptus; the rhythm system; diaphragms; condoms; oral contraceptives; tubal ligation; vasectomy; and vaginal foams, creams and jellies
 
 
 [10]
 Inadequate warning is relevant to all three causes of action asserted by Hill. Inadequate warning of the risks or hazards inherent to a product can be the requisite defect in a products liability cause of action. See supra. In addition, inadequate warning can be evidence of negligence on the part of a manufacturer. Haynes v. Am. Motors Corp., 691 F.2d 1268, 1273 (8th Cir.1982). Moreover, inadequate warning can be evidence of a breach of warranty on the part of a manufacturer. Reid v. Eckerds Drugs, 40 N.C.App. 476, 253 S.E.2d 344 (1979)
 
 
 [11]
 Several courts have refused to apply the learned intermediary rule with respect to oral contraceptives. See, e.g. Odgers v. Ortho Pharmaceutical Corp., 609 F.Supp. 867 (D.C.Mich.1985); MacDonald v. Ortho Pharmaceutical Corp., 394 Mass. 131, 475 N.E.2d 65 (Mass.), cert. denied, 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985). They point to several reasons for this result. Initially, the courts note that a patient's typical involvement in decisionmaking concerning the use of a prescription drug is minimal or nonexistent because the physician makes the major decisions and the patient is in an unlikely position to disagree. But the roles are reversed in the case of contraceptives. In addition, the treatment related to the use of a contraceptive is usually minimal with only the initial examination and prescription followed by annual checkups, giving the physician little opportunity to explore with the patient the possible risks involved. Furthermore, FDA regulations requiring extensive warnings are directed at the ultimate consumer and are designed to ensure that the choice of the contraceptive is an informed choice by the consumer, as well as the prescribing physician. This fact weighs in favor of imposing a common law duty to directly warn the consumer
 
 
 [12]
 It appears from the record and procedural posture that Hill did not see her prescribing physician for over two years after receiving the CU-7
 
 
 [13]
 See Holley v. Burroughs Wellcome Co., 318 N.C. 352, 348 S.E.2d 772 (1986) (the overpromotion by a drug manufacturer may cause the prescribing physician not to rely on the warnings and package inserts associated with a particular drug product.)
 
 
 [1]
 Dr. Davidson was Mrs. Hill's inserting physician. Dr. Reynolds was her treating physician. Dr. Reynolds elaborated on his view of Searle's conduct, adding that Searle was not negligent in any way in connection with the manufacture, sale, or distribution of the CU-7