**Andrea ZANZURI, Plaintiff,**

v.

**G.D. SEARLE & COMPANY, and ABC Pharmaceutical Supply Company, Defendants.**

**No. 87–2370–CIV–WMH.**

United States District Court, S.D. Florida.

Sept. 4, 1990.

Terry Nelson, Hope, Backmeyer & Nelson, P.A., Miami, Fla., for plaintiff.

Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tampa, Fla., for defendant G.D. Searle & Co.

## ORDER

HOEVELER, District Judge.

This cause is before the Court on the motion of Defendant G.D. Searle for summary judgement on the first six counts of Plaintiff's complaint. For the reasons discussed below, Defendant's motion is denied as to Counts I–V, and granted as to Count VI.

## I. BACKGROUND

Plaintiff brings this suit for injuries that she alleges were caused by her use of an intrauterine copper contraceptive (hereinafter "Cu–7") manufactured by Defendant G.D. Searle & Company ("Searle"). Counts I and II allege that Defendant negligently failed to disclose unfavorable information and provided inaccurately favorable information to the general public and physicians about the Cu–7. Count III sounds in common law fraud, alleging that Searle deliberately misinformed the FDA, prescribing physicians, and the general public about the Cu–7. Counts IV and V allege strict liability and breach of warranty. Count VI is a claim for statutory deceit, and Count VII (not subject to the motion before the Court) alleges a violation of the Florida RICO statute.

The Cu–7 is an intrauterine copper contraceptive which is available to women only on the prescription of a physician. It is inserted into the uterus through the vagina and cervix, where it remains until removal by the physician. On October 9, 1981, Plaintiff had inserted a Cu–7 intrauterine contraceptive by Dr. Geoffrey James, a board certified obstetrician/gynecologist. Dr. James testified that by 1981, he had been administering IUDs for approximately eight to ten years and had developed a routine for informing and warning prospective IUD users of the risks in using an IUD, including a discussion with the pro-

spective IUD user of the health risks involved. According to Dr. James, these risks include infection, pelvic inflammatory disease, and ectopic pregnancy (a pregnancy which occurs outside of the uterus, typically in one of the fallopian tubes).

Plaintiff wore the Cu–7 for almost two years. During this period, Dr. James performed three physical examinations, the medical records of which do not report any problems or difficulties associated with the IUD. However, Plaintiff, testifies that she did experience headaches, lethargy, and lower back pains. On April 13, 1983, Plaintiff had the IUD removed by Dr. Straussburg, because she and her husband wished to have another child.

In August 1983, Plaintiff developed an ectopic pregnancy, necessitating the surgical removal of the embryo and the right fallopian tube. In July 1984, Plaintiff developed a second ectopic pregnancy in her left fallopian tube, which was removed by surgery. Dr. Edwards, Plaintiff's primary treating gynecologist, testified that an ectopic pregnancy typically occurs from blockage of the fallopian tube, which can be caused by pelvic inflammatory disease (PID). Plaintiff now seeks to recover damages from Defendant for her pain, suffering, medical expenses incurred, and loss of fertility.

## II. DISCUSSION

Defendant's motion for summary judgment presents the Court with three issues.

First, Defendant moves for summary judgment on the issues of causation and the adequacy of the warning. Defendant contends that under Florida law it is not required to warn the patient of the risks associated with the Cu–7, but rather must only provide adequate warnings to the medical community. Maintaining that the record before the Court demonstrates that there is no controverted factual issues surrounding the adequacy of the warning to the medical community, Defendant concludes that it is entitled to summary judgment.

Second, Defendant contends Counts IV and V of the complaint should be dismissed on the grounds that Defendant is not strictly liable to Plaintiff under Florida law.

Third, Defendant moves for summary judgment on Count VI of the complaint which alleges statutory deceit. Defendant maintains that the statute under which Plaintiff purports to state a claim was not enacted until after the injuries were allegedly sustained by Plaintiff.

## A. STANDARD ON SUMMARY JUDGMENT

■ The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As set forth in the Rule, summary judgment may be entered only where there is *no* genuine issue of material fact. Moreover, the moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970).

In applying this standard, the Eleventh Circuit has explained that:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608; [*Environmental Defense Fund v.*] *Marsh*, 651 F.2d [983] at 991 [ (5th Cir.1981) ]. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.*, 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh*, 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Insurance Co.*, 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment

may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply* 420 F.2d at 1213....

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh*, 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied, notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–612 (5th Cir. 1967). *See, Dalke v. Upjohn Co.*, 555 F.2d 245, 248–49 (9th Cir.1977). *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368–1369 (11th Cir.1982).

■ In opposing a motion for summary judgment, the non-moving party may not rest upon mere allegations, but must rebut any facts presented by the moving party in order to demonstrate the existence of a genuine and material issue of fact for trial. *Adickes*, 398 U.S. at 160, 90 S.Ct. at 1609–10, 26 L.Ed.2d at 156. Furthermore, the mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 214 (1986). In determining whether this evidentiary threshold has been met, the trial court must "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* 477 U.S. at 254, 106 S.Ct. at

2512, 91 L.Ed.2d at 215. If the non-movant fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.*, 477 U.S. at 253, 106 S.Ct. at 2512, 91 L.Ed.2d at 215. Moreover, summary judgment is mandated, if after adequate time for discovery, the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273 (1986).

## B. THE "LEARNED INTERMEDIARY" DOCTRINE

■ As a general rule, the manufacturer of a product has a duty to warn the users of dangers inherent in the use of that product. One exception to this rule, however, is the "learned intermediary" doctrine, whereby the manufacturer of a prescription drug discharges its duty to warn by providing an adequate warning to the prescribing physician. As noted by the Eighth Circuit:

> There are several arguments supporting the application of this exception to prescription drug products. First, medical ethics and practice dictate that the doctor must be an intervening and independent party between patient and drug manufacturer. Second, the information regarding risks is often too technical for a patient to make a reasonable choice. Third, it is virtually impossible in many cases for a manufacturer to directly warn each patient.

*Hill v. Searle Laboratories*, 884 F.2d 1064, 1070 (8th Cir.1989). Although the "learned intermediary" exception has been questioned and rejected in the context of birth control devices by some courts,[1] the doctrine continues to enjoy solid support under

---

[1] For example, the Michigan courts have concluded that contraceptives should not be subject to the learned intermediary doctrine because the use of contraceptives, unlike most prescription drugs, is initiated and directed by the patient, not the physician. This increased role of the patient has caused the manufacturers to direct their literature at prospective patients, creating a consumer/producer relationship for which the reasoning of the learned intermediary doctrine is inapplicable. *See, e.g., Odgers v. Ortho Pharmaceutical Corp.*, 609 F.Supp. 867 (E.D.Mich.1985); *Stephens v. G.D. Searle*, 602 F.Supp. 379 (E.D.Mich.1985).

Florida law. In the case of *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So.2d 820 (Fla.App.1981), the court held that a manufacturer of prescription drugs is only under a duty to warn the medical community:

> A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs.

*Buckner* at 822 (citations omitted). As the Florida Supreme Court recently stated in the case of *Felix v. Hoffman–LaRoche, Inc.*, 540 So.2d 102, 104 (Fla.1989):

> [I]t is clear that the manufacturer's duty to warn of [the drug's] dangerous side effects was directed to the physician rather than the patient. *Buckner v. Allergan Pharmaceutical, Inc.*, 400 So.2d 820 (Fla. 5th DCA), *review denied*, 407 So.2d 1102 (Fla.1981). This is so because the prescribing physician, acting as a "learned intermediary" between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the drug to meet the patient's needs. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.), *cert. denied*, 419 U.S. 1096 [95 S.Ct. 687, 42 L.Ed.2d 688] (1974).

Thus, in Florida, the manufacturer of a prescription drug must provide the prescribing physician with an adequate warning. The properly warned physician then becomes a "learned intermediary" operating to break the causal link between the manufacturer and plaintiff, thereby insulating the manufacturer from tort liability for harm caused by the drug.

Defendant presents three points for consideration in light of the learned intermediary doctrine. First, Defendant claims that the warning provided to the physician with the Cu–7 was so clear and unambiguous that Defendant's duty to warn the medical

community has been discharged as a matter of law. Alternatively, Defendant argues that even if the warnings were not so clear as to warrant judgment for Defendants as a matter of law, Defendant is nevertheless entitled to summary judgment since a factual evaluation demonstrates that the warnings to the medical community were adequate. Finally, Defendant maintains that even if the warnings were inadequate, it is entitled to summary judgment because the prescribing physician was independently aware of the risks involved with the Cu–7. In response to Defendant's arguments under the learned intermediary doctrine, Plaintiff argues that the entire doctrine is inapplicable to this case since the FDA imposed a duty on Defendant to warn the patient directly. The Court first examines Plaintiff's argument concerning the FDA regulations, describes the warnings supplied by Defendant, and then explores each of Defendant's three positions under the learned intermediary doctrine.

### 1. *Defendant's Duty to Warn Imposed by Federal Law*

■ In response to Defendant's "learned intermediary" defense, Plaintiff asserts that the Food and Drug Act, 21 C.F.R. Section 310.502(2),[2] imposes on Defendant a duty to warn the patient directly, the breach of which gives rise to strict liability under state law. In essence, Plaintiff contends that Defendant's "learned intermediary" defense is displaced by a federally imposed duty to warn Plaintiff of the risks inherent with IUD use.

In addressing a similar problem in the context of oral contraceptives, the case of *Lukaszewicz v. Ortho Pharmaceutical Corp.*, 510 F.Supp. 961, *amended*, 532 F.Supp. 211 (E.D.Wisc.1981) ruled that, despite the existence of the "learned intermediary" doctrine, the FDA creates an obligation on the part of the drug manufacturer to warn the patient of potential risks, the breach of which gives rise to liability

**2.** The regulation provides in pertinent part that: [l]abeling, in sufficient quantities to be available to patients who express interest in IUDs, shall accompany each drug IUD (packaged separately from the sterile packaging), [and] be made available to the patient.... 21 C.F.R. 310.-502(2).

under Wisconsin tort law as negligence *per se*. However, the *Lukaszewicz* ruling was clearly based on the Court's belief that Wisconsin state law of *negligence per se* provided for liability where Defendant had violated a federally imposed duty. By contrast, Plaintiff has presented this Court with no authority indicating that the Florida Courts would take the same approach. Rather, as discussed above, the Florida courts without exception sanction the "learned intermediary" doctrine which is clearly at odds with the federal duty to warn the patient which is arguably embodied in 21 C.F.R. Section 310.502(2). Although failure to comply with federal standards might very well provide a vehicle by which to argue that the manufacturer was negligent, this Court is not persuaded that the federal regulations contained in 21 C.F.R. Section 310.502 should redefine the scope of this cause of action under *state* law.

### 2. *The Warnings Supplied By Defendant*

Every Cu–7 purchased by a physician is accompanied by a "package insert", which provides instructions on insertion and warnings regarding potential health risks. Under the heading "warnings", the insert provides:

> ... 3. *Pelvic Infection:* An increased risk of pelvic inflammatory disease associated with the use of IUDs has been reported. While unconfirmed, this risk appears to be greatest for young women who are nulliparous and/or who have a multiplicity of sexual partners.... The decision to use an IUD in a particular case must be made by the physician and patient with the consideration of a possible deleterious effect on future fertility.

Under a section entitled "adverse reactions," the insert provides:

> Pelvic infection, including salpingitis with tubal damage or occlusion has been reported. This may result in future infertility.... The following complaints have also been reported with IUDs although their relation to the Cu–7 has not been established: amenorrhea or delayed menses, backaches, cervical erosion, cystic masses in the pelvis, vaginitis, leg pain or soreness, weight loss or gain, nervousness, dyspareunia, cystitis, endometritis, septic abortion, septicemia, leukorrhea, ectopic pregnancy, difficult removal, uterine embedment, anemia, pain, neurovascular episodes including bradycardia and syncope secondary to insertion, dysmenorrhea, and fragmentation of the IUD.

### 3. *Adequacy of the Warnings as a Matter of Law*

As noted above, a drug manufacturer will not be held liable in Florida where it can show that it provided the medical community with an adequate warning of the risks associated with the product. In the case of *Felix v. Hoffman–LaRoche, Inc.*, 540 So.2d 102, 105 (Fla.1989), the Florida Supreme Court stated that although the adequacy of warnings concerning drugs is normally a question of fact, it can "become a question of law where the warning is accurate, clear and unambiguous." The *Felix* Court found that the manufacturer's warning concerning acne medication was adequate as a matter of law where it warned physicians that the product should *not* be prescribed to "patients who are pregnant or intend to become pregnant while undergoing treatment." *Felix*, 540 So.2d at 103 (emphasis supplied). Unlike the categorical negative—"should not be prescribed"—present in the *Felix* warning, the warning accompanying the Cu–7 merely warns of that "[a]n increased risk of pelvic infection associated with the use of IUDs has been reported". The warning continues that "[w]hile unconfirmed, this risk appears to be greatest for young women who have never had a baby ...". Far from a model of clarity, the Cu–7 warning is the very example of a qualified warning, the adequacy of which must be resolved through a highly intensive factual inquiry. It is into the first stage of this factual inquiry that the Court now embarks.

### 4. *Factual Evaluation of the Warnings on Summary Judgment*

■ Failing to show adequacy as a matter of law, Defendants claim that as a factual matter, the warning supplied with

the Cu–7 adequately apprised the medical community of the risks associated with the product. The warning mentions the risks entailed in the use of the Cu–7, but states merely that incidents of pelvic inflammatory disease (PID) have been "reported", and that the reports of such problems are "unconfirmed". Dr. Daniel O'Brian, a Ph.D. retained as an expert by Plaintiff, testified by affidavit that the language in the guide for the physician did not adequately convey the information regarding the increased risk of the development of PID as reflected in medical literature, and that Defendant's warnings in fact tried to "minimize or negate" any warnings present in the physician package insert and patient brochure. Dr. O'Brian further opined that the warning was inadequate in that it did not present data to the physician or patient upon which they could make a judgement as to the comparative risk of developing pelvic inflammatory disease while wearing an IUD, versus such risk when using other forms of contraception.

Another of Plaintiff's experts, Dr. Harvey L. Bank, states through affidavit that the design of the Cu–7, specifically the tailstring, was defective, and that its deficiencies were not indicated in the warning. Additionally, Dr. Bank commented that the risks of PID and subsequent infertility as reported in Defendant's literature mischaracterized the relationship and incidence of PID that Defendant knew or should have known existed. These disputed issues of material fact are sufficient to defeat Defendant's motion for summary judgment on the issue of the adequacy of the warnings.

### 5. The Prescribing Physician as a Learned Intermediary Through Independent Knowledge

■ In the case of Felix v. Hoffman–La-Roche, Inc., supra at 105, the Florida Supreme Court stated that notwithstanding an inadequate warning by the manufacturer, the learned intermediary doctrine could nevertheless shield the manufacturer from liability where the prescribing physician was independently aware of the risks involved with the product:

[E]ven if it could be said that there was a factual dispute concerning the adequacy of the warning, any breach of the duty to warn in this case could not have been the proximate cause of the damage. The [trial] court reached this conclusion because the prescribing physician testified that he fully understood the warnings and also had prior knowledge of the teratogenic propensities of Accutane. Therefore we agree that any inadequacy in the Accutane warning could not have been the proximate cause of the birth defects in this case.

In line with Felix, Defendant claims that the prescribing physician in the case at bar, Dr. James, was aware of the relevant risks from his general experience as a gynecologist, his subscription to professional journals, and his residency at Lenox Hill Hospital in New York, where he frequently inserted the Cu–7. The record does indeed indicate that Dr. James was generally informed as to the dangers associated with the Cu–7. At deposition, Dr. James indicated that at the time of Plaintiff's insertion, he was aware that the IUD could cause infections which could in turn result in "damage to the [fallopian] tubes which may prevent pregnancy or may result in abnormal pregnancy, such as an ectopic pregnancy." Deposition of Dr. James at 8. Furthermore, Dr. James stated that he was aware that these infections could "result in infertility." Id. at 14. In short, Defendant concludes that Dr. James is the archetypical "learned intermediary" who, despite an allegedly inadequate warning, was nevertheless fully informed as to the risks associated with the product.

Notwithstanding Defendant's lauding of Dr. James' independently acquired acumen concerning the Cu–7, the record as presented gives this Court reason to pause before casting Dr. James in the leading role of an independently informed learned intermediary. The Felix Court specifically noted that there was "no contention that the warning given in this case contained any misstatements". Felix, supra at 104. In contrast to Felix, Plaintiff in the case at bar vehemently contends that the warnings provided by Defendant regarding the Cu–7 did contain misrepresentations which mislead the medical community as to the mag-

nitude of the risks involved. In support of these allegations of misrepresentative "warnings", Plaintiff offers the affidavits of various medical experts. Through affidavit, Dr. Harvey Bank, states that in his opinion Defendant "mischaracterized the relationship and incidence of PID Searle knew or should have known existed." Additionally, Dr. Bank states that Defendant's "medical studies and record keeping were inadequate ... to determine the actual rate of PID experienced with the use of the device. However, [Defendant] reported an inaccurate rate to the FDA and used the inaccurate rate as a basis for some of its statements in the patients [sic] booklet and physicians [sic] inserts".

Although the line drawn between misstatements in the warning, and general inadequacy of the warning may at first blush seem enigmatic and elusive, close inspection reveals considerable persuasive force behind the increased threshold that must be met when attempting to qualify the prescribing physician as a learned intermediary after being exposed to misrepresentative product warnings. In his deposition, Dr. James admits that he relied heavily on the literature supplied by Defendant in forming his opinion as to the risks associated with Cu–7.[3] The "independent knowledge" category of the learned intermediary doctrine is necessarily premised on the ability of the physician to move beyond the educative deficiencies of the product warning in forming a realistic opinion of the product's risks through an independent research of professional journals. If Defendant's literature were merely inadequate, yet devoid of material misstatements, it is entirely conceivable that the prescribing physician could reach the fully informed state of a "learned intermediary" through independent reading. When, however, the universe of information from which the physician must piece together a conception of the totality of the risks involved with a product includes misstatements by the product manufacturer, the physician's task becomes Herculean, for he or she must not only supplement the warning, but actually refute the errors communicated by the manufacturer.

This is not to say that it is impossible for a manufacturer to show that the physician had formed an accurate opinion as to a product's safety where the product warning contains misstatements from the manufacturer. Rather, the presence of misstatements in the manufacturer's literature heightens the evidentiary threshold which must be crossed by the manufacturer on summary judgment in its endeavor to show that the physician was an intermediary sufficiently informed to interrupt the causal link of liability between the manufacturer and the plaintiff as a matter of uncontroverted fact. In sum, the record presented is not sufficiently compelling to persuade this Court that despite the presence of possible misstatements, Dr. James was nevertheless fully informed as to the risks associated with the Cu–7.

## C. STRICT LIABILITY AND THE APPLICABILITY OF COMMENT K

■ Having adopted section 402A of the Restatement (Second) of Torts, Florida imposes strict liability upon manufacturers for unavoidably dangerous products which are sold with the knowledge that they are to be used by consumers without any inspection by them for defects. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 86 (Fla. 1976). However, Florida has adopted Comment k to Section 402A, which creates an exception to strict liability for products which are "incapable of being made safe" provided that they are "properly prepared" and marketed with a "proper warning":

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences

---

**3.** At his deposition, Dr. James was asked the following question: "At the time you inserted the IUD in [Plaintiff], was your information concerning the rate of pelvic infection relied partially on the documentation provided to you by Searle?" In response, Dr. James answered, "Partly, yes". Deposition of Dr. James at 26.

when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desireable product, attended with a known but apparently reasonable risk.

Defendant argues that Comment k operates to exempt the Cu–7 from strict liability. Plaintiffs, however, contend that the Cu–7 does not fall within the scope of Comment k, on the grounds that Comment k should apply only to drugs which are "incapable of being made safe" such as a rabies vaccine, and not to common drugs such as birth control devices. The approaches taken by Courts facing the question of whether or not a certain product is encompassed by Comment k have followed two distinct paths. Many Courts have concluded that Comment k is applicable to all prescription drugs. *See, e.g., Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87 (2d Cir.1980); *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988); *McKee v. Moore,* 648 P.2d 21 (Okl.1982); *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975, 977–78 (1978).

Other Courts, however, have limited the application of Comment k to "circumstances when it is shown that the product is incapable of being made safe given the present state of human knowledge but possesses such a high degree of social need so that its use is warranted, provided warnings are adequate." *Hill v. Searle Laboratories,* 884 F.2d 1064, 1068 (8th Cir.1989) (holding that whether a product is within Comment k should be determined on a case by case basis where it is shown that the product is unavoidably unsafe *and* product of "exceptional social need"); *see also, Coursen v. A.H. Robins Co.,* 764 F.2d 1329, 1337 (9th Cir.1985); *Kociemba v. G.D. Searle & Co.,* 680 F.Supp. 1293, 1301 (D.Minn.1988); *Patten v. Lederle Laboratories,* 676 F.Supp. 233, 236 (D.Utah 1987); *Hawkinson v. A.H. Robins Co., Inc.,* 595 F.Supp. 1290, 1308 (D.Colo.1984).

One obvious appeal of adopting the bright-line rule that all prescription drugs are protected by Comment k is that such a rule would avoid the necessity of making difficult decisions as to which drugs are unavoidably unsafe, and which ones could be made safer. Yet however expedient such a clear-cut rule might be, this interpretation of Comment k would appear to be rejected by the clear wording of the Comment itself. Rather than simply stating that all prescription drugs are within its domain, Comment k explicitly specifies three prerequisites which must be met before a product falls within its protection. First, the product must be "incapable of being made safe." Second, the product must be "properly prepared and marketed". Third, a "proper warning" must be given. Applying Comment k to all prescription drugs completely ignores these three expressly stated prerequisites. Moreover, as noted by the Eighth Circuit in *Hill, supra* at 1069, such a blanket exception to strict liability for all prescription drugs was proposed at the American Law Institute meeting where section 402A and Comment k were adopted, but this proposal was defeated. 38 ALI Proc. 19, 90–98 (1961). Indeed, the example provided in the body of Comment k—Pasteur's rabies vaccination—indicates that Comment k was

designed to apply to drugs which are unavoidably unsafe, but are nonetheless desireable for use in treating an affliction with greater destructive effects. In contrast to the example of the rabies vaccination, the Cu-7 is not the *sine qua non* of birth control, but only one alternative amongst a host of competing products. In Florida, this interpretation finds support in the case of *Russell v. Community Blood Bank, Inc.*, 185 So.2d 749, 755 (Fla.App. 1966), and in the case of *McLeod v. W.S. Merrell Co., Div. of Richardson–Merrell*, 174 So.2d 736 (Fla.1965), where the court stated that before applying Comment k, it was necessary for the court to find that the product was "unavoidably unsafe".

 Thus, this Court concludes that in order to avail itself of the affirmative defense to strict liability provided by Comment k, a defendant must satisfy the following three requisite elements: that the drug be (1) incapable of being made safe; (2) properly prepared and marketed; and, (3) accompanied by a proper warning. As to the first and second elements, although the Court suspects that they both can be demonstrably satisfied without difficulty, the record presented is insufficient to support a finding that the Cu-7 was incapable of being made safe and was in fact properly prepared to specifications. Concerning the final element, (as discussed in Section II–B–2 above), scrutiny of the record reveals that the issue of the adequacy of the warning is plagued with far too many controverted issues of fact to be susceptible to summary disposition at this time.

### D. COUNT VI: STATUTORY DECEIT

 Count VI of the Complaint alleges a claim for statutory deceit pursuant to Chapter 499, Florida Statutes, the Florida Drug and Cosmetic Act, ("The Act"). Defendant maintains that Chapter 499 is inapplicable because it was enacted after the alleged acts of fraud and deceit. Chapter 499 of The Act became effective on October 1, 1982. Chapter 82–225, Section 43, Laws of Florida. Plaintiff was inserted with her Cu-7 in October 1981, a year *before* the effective date of Chapter 499. It is a well-established rule of statutory construction that statutes are presumed to

operate prospectively only, absent clear legislative intent to the contrary. *Seddon v. Harpster*, 403 So.2d 409, 411 (Fla.1981). Plaintiff does point out that prior to Chapter 499, Chapters 500.01, and 500.02 prohibited false advertising of drugs, and could therefore support the same action. However, if Plaintiff wishes to pursue an action under either of these statutes, she must amend her complaint to so reflect.

In light of the above, Plaintiff's claim for statutory deceit is dismissed. Plaintiff will have thirty days in which to amend her claim in conformity with the proper statute.

### III. CONCLUSION

In conclusion, Defendant's summary judgment is denied as to Counts I–V, and granted as to Count VI. Plaintiffs shall have thirty days in which to amend Count VI.

DONE AND ORDERED.