[No. 45110.   En Banc.   April 27, 1978.]

ROBERT C. TERHUNE, JR., ET AL, *Appellants,* v.
A. H. ROBINS COMPANY, *Respondent.*

*McMullen, Brooke, Knapp & Alexander,* by *Robert E. Brooke,* for appellants.

*Williams, Lanza, Kastner & Gibbs, Gerald A. Palm,* and *William J. Leedom,* for respondent.

ROSELLINI, J.—This action was brought against the manufacturer of the Dalkon Shield, an intrauterine contraceptive device, to recover damages which the plaintiff wife

allegedly sustained as a result of her use of one of these devices.

According to the evidence, after the birth of their second child the plaintiffs sought advice from their family physician, an osteopathic surgeon, regarding available methods of contraception. He informed them of the advantages and disadvantages of various methods, and they chose the Dalkon Shield. The defendant manufacturer supplied these shields only to doctors and not to the public, since their insertion required medical expertise and equipment. The doctor was instructed on the proper procedure to use in making the insertion and was advised of hazards connected with the use of these devices, including the danger of perforation of the uterus if the shield was not carefully inserted according to the directions given. The doctor was also supplied with brochures, which the doctor could, in his discretion, give to his patients, describing the device and touting its advantages over other contraceptive methods (although not claiming that it was 100 percent effective in preventing pregnancy).

The plaintiffs' doctor could not remember clearly whether he had read the warning about the danger of perforation, but testified that in any event he was fully aware of the danger when he made the insertion. The plaintiffs were given a brochure but were not told of the danger of perforation, according to their testimony. Two weeks after the insertion was made, the plaintiff wife returned to the doctor complaining of pain in the lower abdominal area. He checked a string attached to the shield, which was designed to afford a means of determining that the shield was in place, and was apparently satisfied that nothing was wrong.

A year later, after she had ceased nursing the second child, the plaintiff wife became pregnant. Her doctor contacted the defendant and asked for advice as to what to do about the shield. The defendant's house physician advised him to attempt to remove the shield by pulling the string attached to it; and if this could not be done successfully, to recommend an abortion, since there was a danger that the

fetus might be injured by the presence of the shield. An attempt to remove the shield proved unsuccessful. The plaintiffs refused to consent to an abortion, although they were told of the risk involved. When the pregnancy had progressed to the fifth month, a spontaneous aseptic abortion occurred, which may have been caused by an infection in the urinary tract. There was no evidence that it was caused by the presence of the intrauterine device in the uterus.

The shield was not expelled when the fetus was aborted. It was located subsequently by use of X rays, and surgery was performed to remove it. The shield was not in its correct position but was found imbedded in a broad ligament adjacent to the uterus, which it had perforated. An infection was present which drained for a period of several months.

Three experts called by the defense, a doctor associated with the Virginia Mason Clinic in Seattle, who was chairman of Seattle Planned Parenthood, a professor of obstetrics and gynecology at the University of California at Los Angeles Medical School, and an associate professor of obstetrics and gynecology at Wayne State University, all testified that in their opinion the perforation occurred when the shield was inserted. All of these were board–certified gynecologists and obstetricians. Their testimony was buttressed by that of a professor of mechanical engineering at Drake University, whose studies had convinced him that spontaneous migration of the shield was physically impossible.

The only dissenting opinion was that of the plaintiffs' physician who inserted the shield, whose credentials did not rise to this dignity.[1] His view was that the shield must have migrated from the correct position in which he had placed it, causing the perforation, but he conceded that his opinion was based on speculation.

---

[1]This physician had inserted approximately 2 dozen Dalkon Shields at the time he attended the plaintiff wife on this matter. The obstetrician–gynecologist from the Mason Clinic had inserted between 1,000 and 1,500; the UCLA professor

After the shield was removed, the plaintiff wife again became pregnant and delivered a child without difficulty. She subsequently underwent a tubal ligation, performed by the Mason Clinic doctor who testified for the defendant.

It was the plaintiffs' theory that the injury resulting from the perforation of the uterus was caused by a defect in the defendant's product. They failed to prove that the shield was defective in either design or manufacture, and the court so instructed the jury. The assignments of error on appeal focus on the defendant's duty to warn of dangers attendant upon the use of the shield.

The rules which apply in circumstances such as these are found in Restatement (Second) of Torts § 402A (1965), which this court has adopted in a series of cases beginning with *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969). The principles were most recently applied in *Haysom v. Coleman Lantern Co.,* 89 Wn.2d 474, 573 P.2d 785 (1978).

■ Section 402A embodies a doctrine of strict liability with respect to products which are introduced into the stream of commerce. We have approved the principle that, even where a product is faultlessly designed, it may be considered unreasonably unsafe if it is placed in the hands of the ultimate consumer unaccompanied by adequate warning of dangers necessarily involved in its use. *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 570 P.2d 438 (1977); *Haysom v. Coleman Lantern Co., supra. In accord: Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 550 P.2d 71 (1976).

Comment *k* governs this case. It states:

> *k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it

---

had inserted about 400, and the Wayne State University associate professor had inserted approximately 1,000.

is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

It will be seen that this comment speaks of "drugs, vaccines, and the like", including experimental drugs, which cannot legally be sold except to a physician. The comment does not purport to state what is "proper warning" where such a product is involved. However, it has become a well-established rule that in such cases, the duty of the manufacturer to warn of dangers involved in use of a product is satisfied if he gives adequate warning to the physician who prescribes it. *Smith v. E.R. Squibb & Sons, Inc.,* 69 Mich. App. 375, 245 N.W.2d 52 (1976); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir. 1974); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Ore. 375, 528 P.2d 522 (1974); *Hines v. St. Joseph's Hosp.,* 86 N.M. 763, 527 P.2d 1075 (1974); *Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa. Super. 418, 307 A.2d 449 (1973); *Mulder v. Parke Davis & Co.,* 288 Minn. 332, 181 N.W.2d 882 (1970); *Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir. 1969); *Johnston v.*

*Upjohn Co.,* 442 S.W.2d 93 (Mo. Ct. App. 1969); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968); *Stottlemire v. Cawood,* 213 F. Supp. 897 (D.D.C. 1963); *Parker v. State,* 201 Misc. 416, 105 N.Y.S.2d 735 (1951); *Hamilton v. Hardy,* 549 P.2d 1099 (Colo. Ct. App. 1976).

The reasons for this rule should be obvious. Where a product is available only on prescription or through the services of a physician, the physician acts as a "learned intermediary" between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. The patient is expected to and, it can be presumed, does place primary reliance upon that judgment. The physician decides what facts should be told to the patient.[2] Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient. It has also been suggested that the rule is made necessary by the fact that it is ordinarily difficult for the manufacturer to communicate directly with the consumer.

While recognizing the efficacy of this rule as applied to prescription drugs, the plaintiffs question its applicability to devices such as the Dalkon Shield. In advising upon the selection of a contraceptive, they say, the physician is not

---

[2]A physician has a duty to disclose what a reasonably prudent physician in the medical community in the exercise of reasonable care would disclose to his patient concerning any grave risks of injury which may be incurred from a proposed course of treatment, so that the patient, exercising ordinary care for his own welfare, and faced with the choice of undergoing the proposed treatment, or alternative treatment, or none at all, can, in reaching a decision, intelligently exercise his judgment by reasonably balancing the probable risks against the probable benefits. *ZeBarth v. Swedish Hosp. Medical Center,* 81 Wn.2d 12, 499 P.2d 1, 52 A.L.R.3d 1067 (1972).

attempting to cure a malady and does not "rely upon his many years of education and experience" to select an appropriate medication. We do not see this as a significant distinction. The physician does not confine his practice to the curing of maladies. He is concerned with the total health and physical well–being of his patients and appropriately gives advice upon preventive measures. Certainly the insertion of the Dalkon Shield requires a physician's services, his knowledge and his skill. While the physician does not make the final choice but leaves that to the patient, he advises the patient with respect to the advantages and disadvantages of various choices, as was done in this case, and it is he who supplies and inserts the device.

The fact that the patient makes the final choice among suggested contraceptives (or decides not to use any at all) does not constitute a distinction which makes the general rule inapplicable. We can readily conceive of situations in which a physician gives the patient a choice of courses to follow. There is, for example, a patient's choice between continuing to endure a physical ailment or submitting to surgery or some other course of treatment; an obese person's choice among diets suggested by the doctor; and a surgery patient's choice of anesthesia where, in the doctor's opinion, a choice is permissible.

In any such situation which may come to mind, the patient is expected to look to the physician for guidance and not to the manufacturer of the products which he may use or prescribe in the course of treatment.

Contrary to the plaintiffs' suggestion, the courts' holdings that the manufacturer's duty to warn runs only to the medical profession and not to the patient have not been confined to cases where "medicinal drugs" were dispensed. *McEwen v. Ortho Pharmaceutical Corp., supra,* and *Leibowitz v. Ortho Pharmaceutical Corp., supra,* involved oral contraceptives; and *Hines v. St. Joseph's Hosp., supra,* involved blood for transfusions.

It is also argued that, in the instant case, it was not difficult for the manufacturer to reach the consumer, since here

the defendant's brochure (which did not mention the danger of perforation upon insertion) was given to the patient by the doctor. The argument overlooks the fact that the decision to give the brochure to the plaintiffs was made by the doctor. He was fully aware of the danger of perforation and yet did not see fit, at least according to the plaintiffs' testimony, to advise them of it. We must assume that the decision not to give this advice was the result of the exercise of judgment on the physician's part, just as would be a decision not to warn a patient of the possible side effects of any given drug.

It is further urged that products such as the Dalkon Shield should be excluded from the class covered by comment *k* because federal law does not provide the public with the added protection which is attendant upon the approval of a drug by the Food and Drug Administration. We are told that such products may be dispensed without the rigorous prior testing which drugs must undergo.

While a sound public policy might indeed dictate that such testing be undertaken before any product to be used on the human body is released in commerce, a decision of that kind rests with the legislative body. The principles stated in comment *k* do not rest upon a finding or an assumption that all drugs, vaccines or other products obtainable only through a physician have been tested by the Food and Drug Administration. Rather they have their basis in the character of the medical profession and the relationship which exists between the manufacturer, the physician and the patient. We think it safe to surmise that ordinarily a physician will not prescribe or utilize a product which he does not consider reasonably safe, and that he will take into account the amount of testing, or lack thereof, which has been done with respect to the product. But in any event, because it is he who finally controls the dispensing of the product, it is just that he should be fully advised of the characteristics and dangers of the products and that the manufacturer should not be held to account if

it has done its duty in this regard, even though the physician decides, in the exercise of his own judgment, to withhold the information from his patient.

In the instant case, the physician was admittedly aware of the danger of perforation, but apparently he decided that the risk was so minimal that it was not significant. In fact, the evidence showed that perforation, while it may well occur if the insertion procedure is not followed precisely, is comparatively rare.

It is our conclusion that a manufacturer of a product such as the Dalkon Shield (if it qualifies otherwise under comment *k*), which is obtainable only through the services of a physician, fulfills its duty if it warns the physician of the dangers attendant upon its use, and need not warn the patient as well.

The undisputed evidence showed that the medical profession regarded the Dalkon Shield, at the time it was recommended by the plaintiffs' physician, as an acceptable method of contraception, being less troublesome and more effective than other available means, and the plaintiffs have not questioned the importance and desirability of birth control. The Superior Court quite properly held as a matter of law that the shield was not unreasonably dangerous or defective, as defined in comment *k*.

Error is assigned to three instructions which it is said overemphasized the theory of the defense. *Samuelson v. Freeman*, 75 Wn.2d 894, 454 P.2d 406 (1969), is cited. That was a medical malpractice action in which the negligence of the defendant doctor was in dispute. In six different instructions, the lower court had advised the jury that a physician is held to and must apply an average of the skill ordinarily possessed by similar physicians. We held that, although the instructions taken individually were correct statements of law, taken together they prejudicially understated the defendant's duty. The three instructions complained of here advised the jury that if it found the warnings given to the physician were adequate, it should return a verdict for the defendant; that a device such as the

Dalkon Shield, accompanied by proper directions and warnings to the physician, is not defective or unreasonably dangerous; and that a manufacturer has a duty to warn the medical profession and not the user of its risks.

As we read these instructions, the only matter reiterated is that the duty to warn runs to the physician, not the patient. The defendant never contended that it warned anyone other than the physician of the danger of perforation, thus, we do not perceive that the emphasis on this point was likely to have affected the verdict.

Since we have determined that the principles set forth in Restatement (Second) of Torts § 402A, comment *k* (1965), apply here, and since the evidence was undisputed that the defendant warned the plaintiffs' physician of the danger of perforation upon insertion, it is obvious that the jury returned the only verdict which the evidence would warrant.

We have examined the remaining assignments of error, none of which involves a new question of law. We are not persuaded that any of them warrants a reversal or new trial.

The judgment entered on the verdict should be affirmed.

WRIGHT, C.J., STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., and PRICE, J. Pro Tem., concur.

Petition for rehearing denied July 14, 1978.