111 P.3d 857 (2005)
ESTATE OF Sandra LaMONTAGNE, Donald LaMontagne, as Personal Representative of the Estate, Donald LaMontagne, Individually and as Heir of the Estate; Lynn Dollmeyer, Individually and as Heir of the Estate; Juliann Dollmeyer, Individually and as Heir of the Estate, Merrilee Buckley, Individually and as Heir of the Estate, Marlee Riggin, Individually and as Heir of the Estate, June Meehan, Individually and as Heir of the Estate, December LaMontagne, Individually and as Heir of the Estate, Scott LaMontagne, Individually and as Heir of the Estate, Appellants,
v.
BRISTOL-MYERS SQUIBB, a Corporation with its principal place of business in the State of Connecticut; Joseph Eschbach, MD and Jane Doe Eschbach, his wife and their marital community; Adrian Call, MD and Jane Doe Call, his wife and their marital community; John Doe No. 1, and Jane Doe No. 1, his wife and their marital community; John Doe No. 2 and Jane Doe No. 2, his wife and their marital community; John Doe No. 3, a manufacturer of generic metformin, Respondents.
No. 53489-1-I.
Court of Appeals of Washington, Division 1.
April 4, 2005.
Publication Ordered May 4, 2005.
As Corrected May 23, 2005.
*858 Ralph D. Pittle, Bellevue, WA, for Appellants.
Michael R. Scott, Seattle, WA, for Respondents.
SCHINDLER, J.
¶ 1 Juliann Dollmeyer, the personal representative of the Estate of Sandra LaMontagne (the Estate) appeals the trial court's decision on summary judgment to dismiss the Estate's prescription drug product liability claims against Bristol-Myers Squibb Company (BMS). The Estate contends there are material issues of fact about whether the "contraindication" section of the package insert for the prescription drug Glucophage® adequately warned doctors of the risks of lactic acidosis for Type II diabetic patients who also have kidney dysfunction. The Estate also contends there are material issues of fact about whether the negligence of BMS was the proximate cause of Sandra LaMontagne's death and whether the Estate's lawsuit is barred by the statute of limitations. We conclude the warnings contained in the Glucophage® package insert repeatedly and unmistakably warn doctors of the risk of lactic acidosis and the risks of using Glucophage® for patients with kidney dysfunction. We affirm.

FACTS[1]
¶ 2 Sandra LaMontagne, a 58-year-old woman, suffered from a number of long standing health problems including Type II diabetes, kidney dysfunction, liver impairment, obesity, and congestive heart failure.
¶ 3 In 1995-96, LaMontagne experienced several serious episodes of dangerous blood sugar level fluctuations. Despite using insulin for her diabetes, LaMontagne's blood sugar levels were abnormal and she experienced increased edema (swelling). Her primary physician, Dr. Adrian Call, testified that he was having difficulty successfully treating and controlling LaMontagne's diabetes.
*859 ¶ 4 On January 9, 1997, LaMontagne was admitted to Northwest Hospital for anemia and hyperkalemia (elevated potassium levels) and was given blood transfusions. LaMontagne was also continuing to suffer from edema that resulted in a weight gain in one month of 30-40 pounds. According to laboratory tests taken on January 17, LaMontagne an elevated creatinine level of 2.0 mg/dL. For females, a creatinine level above 1.4 mg/dL is abnormal and indicates kidney dysfunction.[2] The laboratory tests also indicated liver impairment with a GGT level of 740. A GGT level for a healthy person is 0-40.
¶ 5 On January 20, Dr. Call prescribed Glucophage® to control LaMontagne's diabetes. In 1997, Glucophage® was a relatively new drug used to treat insulin-resistant diabetic patients. Dr. Call learned about Glucophage® from reading articles and lectures and had previously used Glucophage® to treat 10-20 other diabetic patients.
¶ 6 BMS manufactures the drug metformin under the brand name of Glucophage®. After receiving Federal Drug Administration (FDA) approval, BMS began marketing Glucophage® in the United States in 1995. When metformin accumulates in the blood, it can cause lactic acidosis, a serious and sometimes fatal condition. Metformin is primarily removed from the body by the kidneys. The risk of lactic acidosis significantly increases when a patient has kidney dysfunction. Other risk factors include liver impairment and heart problems including congestive heart failure.
¶ 7 LaMontagne took Glucophage® from January until June 1997. The testimony of LaMontagne's doctors and the medical records establish that they prescribed Glucophage® even though she had kidney dysfunction, the primary risk factor identified for lactic acidosis. During the entire time LaMontagne took Glucophage®, her creatinine level never dropped below 2.0 mg/dL.
¶ 8 Dr. Call testified that he knew when he prescribed Glucophage® that LaMontagne had known risk factors including kidney dysfunction, liver impairment and congestive heart disease and he knew her creatinine levels were elevated.
Q: Now, first of all, did you have any concern at that time that she had any evidence of renal impairment?
A: I did have concern about her renal function. She had had some blood work done in January of '97, January 9th of "97, where her creatnine was 2.5. And she had one subsequent to that visit on January 28, '97 where her creatinine value was 2.3.[3]
....
Q: When you started her on Glucophage she had a known risk factor for lactic acidosis, that being renal impairment, evidenced by elevated creatinine levels, correct?
A: Yes.[4]
....
Q: Another risk factor for lactic acidosis in patients receiving Glucophage is congestive heart failure, is that correct?
A: Yes.
Q: Did Sandra LaMontagne have congestive heart failure during the time that she was receiving Glucophage under your prescription?
A: Yes, I believe that she did have congestive heart failure.[5]
But in Dr. Call's clinical judgment, Glucophage® was the only option left to try and manage LaMontagne's diabetes. At the time there were only three drugs available to control her diabetes and the first two had failed.
¶ 9 Shortly after prescribing Glucophage®, Dr. Call referred LaMontagne to Dr. Joseph Eschbach, a nephrologist, for an evaluation of her kidney dysfunction and edema. Dr. Eschbach knew LaMontagne's creatinine level had elevated to 2.3 mg/dL, and also understood the risks in using Glucophage®. Dr. *860 Eschbach also testified that Glucophage® was the only viable option to manage her diabetes and its benefits out weighed the risks:
Q: Did you understand in January of 1997 that metformin was expressly contraindicated in patients with creatinine levels as high as 2.3?
....
A: I understood the risk involved.
Q: Did you have any concern that the risks exceeded the benefits of metformin as a choice of managing Ms. LaMontagne's diabetes?
A: This had to be put in perspective. It was the only the drug that was managing her diabetes. There were only three drugs available at that time to manage diabetes. The first two failed to do so, and that is why she was placed on metformin. And her husband made it very clear that this drug was the only drug that was controlling her diabetes.[6]
....
Q: So then did she have three things going on that made her lactic acidosis risk elevated; one, some renal impairment; two, some congestive heart failure; and, three, some liver impairment?
A: Those are all considered risk factors.[7]
¶ 10 When Dr. Eschbach saw LaMontagne on February 13, LaMontagne reported that she felt better and had lost 40 pounds but her creatinine level was 2.9 mg/dL. LaMontagne saw Dr. Call and Dr. Eschbach again on February 27. Her creatinine level was 3.5 mg/dL and her liver function was abnormal. Dr. Eschbach also noted that LaMontagne had increased her Glucophage® dosage on her own.
Q: Did it concern you that increasing dosages of metformin increased the risk of lactic acidosis?
A: Yes.
....
A: The problem was that we clearly recognized the risk involved with the medication, and yet there was no other option in terms of trying to control her blood sugars, which were well controlled. I was trying to make sure her renal function was well-monitored, and that her liver function was optimized as best we could, in order to try to reduce whatever risk there was to her from the metformin.[8]
Between April and June 1997 the laboratory reports show that LaMontagne's creatinine levels remained elevated between 2.1 and 2.5 mg/dL.
¶ 11 On June 17, LaMontagne was admitted to Northwest Hospital. Her metformin level was fourteen times the maximum therapeutic level and her creatinine level was 4.9 mg/dL. LaMontagne was diagnosed with metformin-induced lactic acidosis causing an acute renal failure and was aggressively treated with antibiotics. She recovered from lactic acidosis and was discharged on July 7 but was readmitted on July 15 with low blood pressure and an overwhelming bloodstream infection (sepsis). On July 26, 1997, LaMontagne died from sepsis.
¶ 12 On July 25, 2000, the Estate sued Dr. Call, Dr. Eschbach, and BMS. The Estate alleged that BMS did not adequately inform her doctors of the risks associated with the use of Glucophage® and the failure to adequately warn was a proximate cause of LaMontagne's death. The Estate alleged that if BMS's warnings were adequate, then Dr. Call and Dr. Eschbach were negligent in using Glucophage® and failing to inform LaMontagne of the risks involved.[9]
¶ 13 BMS moved for summary judgment. BMS claimed the warnings were adequate as a matter of law because the Glucophage® package insert warned about lactic acidosis and the use of Glucophage® for patients like LaMontagne. BMS also argued that the warnings were not the proximate cause of LaMontagne's death and the Estate's lawsuit was barred by the statute of limitations. The trial court granted summary judgment *861 and dismissed the Estate's claims against BMS.

ANALYSIS
¶ 14 LaMontagne argues there is a material issue of fact as to whether listing renal impairment under the "Contraindications" heading in the Glucophage® package insert adequately warns doctors that Glucophage® should never be used in patients with mild-to-moderate kidney dysfunction. LaMontagne also argues there is a material issue of fact as to whether the Glucophage® insert warning was the proximate cause of Sandra's death and whether the Estate's lawsuit is barred by the statute of limitations.
¶ 15 On review of a decision to grant summary judgment, this court engages in the same inquiry as the trial court and reviews the motion for summary judgment de novo. Reynolds v. Hicks, 134 Wash.2d 491, 495, 951 P.2d 761 (1998). Summary judgment is appropriate if the pleadings and affidavits, if any, show there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. CR 56. The moving party bears the burden of demonstrating there is no genuine dispute as to any material fact. Green v. A.P.C., 136 Wash.2d 87, 100, 960 P.2d 912 (1998). The court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. Right-Price Recreation, LLC v. Connells Prairie Cmty. Council, 146 Wash.2d 370, 381, 46 P.3d 789 (2002). Generally, the adequacy of a warning will be a question of fact. See Little v. PPG Indus., Inc., 92 Wash.2d 118, 123, 594 P.2d 911 (1979) (citing Haysom v. Coleman Lantern Co., 89 Wash.2d 474, 573 P.2d 785 (1978)). But a question of fact can be determined as a matter of law when reasonable minds can reach only one conclusion from the admissible evidence. Smith v. Safeco Ins. Co., 150 Wash.2d 478, 485, 78 P.3d 1274 (2003).

Glucophage® Package Insert Warnings

¶ 16 Whether a prescription drug manufacturer provides adequate warnings to physicians is governed by the negligence standard under the Restatement (Second) of Torts § 402A, cmt. k (1965). Comment k, adopted by the Washington Supreme Court in Terhune v. A.H. Robins Co., 90 Wash.2d 9, 12-13, 577 P.2d 975 (1978), is an exception to strict liability for unavoidably unsafe products. See also Ruiz-Guzman v. Amvac Chem. Corp., 141 Wash.2d 493, 7 P.3d 795 (2000). Comment k imposes a duty on a drug manufacturer to warn of the known dangers and risks associated with prescription drugs:

Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
*862 ¶ 17 A warning for a prescription drug may be adequate as a matter of law if it provides specific and detailed information about the risks of using the drug. Restatement (Second) of Torts § 402A, cmt. k (1965). To determine whether a warning is adequate requires an analysis of the warnings as a whole and the language used in the package insert. The court must examine the meaning and context of the language and the manner of expression to determine if the warning is accurate, clear and consistent and whether the warning portrays the risks involved in taking the prescription drug. Martin v. Hacker, 83 N.Y.2d 1, 10-11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); cf. Little v. PPG Indus., Inc., 92 Wash.2d 118, 121-22, 594 P.2d 911 (1979) (determining the adequacy of a warning by examining whether the warning sufficiently attracted the attention of the product users and informed them of the dangers of the product).
¶ 18 In addressing whether a drug manufacturer has met its duty to give adequate warnings for prescription drugs, Washington has adopted the "learned intermediary" doctrine. See Terhune, 90 Wash.2d at 13-14, 577 P.2d 975. Under the learned intermediary doctrine a drug manufacturer satisfies its duty "to warn of dangers involved in use of a product ... if it gives adequate warning to the physician who prescribes it." Id. at 13, 577 P.2d 975. The Terhune Court explained that when a product that is available only through prescription
is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient.[10]
¶ 19 To ensure that a prescription drug is reasonably safe, a manufacturer has a duty to provide warnings or instructions commensurate with its harm and the risk. RCW 7.72.030(1)(b). Because the Food and Drug Administration regulations provide only the minimum requirements for drug manufacturers, compliance with those regulations does not necessarily establish warnings were adequate. See Wash. State Physicians Ins. Exchange & Assoc. v. Fisons Corp., 122 Wash.2d 299, 328-29, 858 P.2d 1054 (1993).
¶ 20 The Estate argues that the testimony of Dr. Frederick Wolff and Dr. Call supports a reasonable inference that BMS failed to adequately warn of the risks of prescribing Glucophage® to patients with mild-to-moderate kidney dysfunction for two reasons: (1) because BMS failed to clearly communicate to physicians in the "contraindications" section that the risks of using Glucophage® outweigh its benefits in patients with mild-to-moderate kidney dysfunction and (2) BMS did not expressly warn physicians that Glucophage® should never be used in these circumstances.[11]
¶ 21 The CONTRAINDICATIONS section of the BMS package insert for Glucophage® provides:
CONTRAINDICATIONS:
GLUCOPHAGE is contraindicated in patients with:
1. Renal disease or renal dysfunction (e.g., as suggested by serum creatinine levels ≥ 1.5 mg/dL [males], ≥ 1.4 mg/dL [females] or abnormal creatinine clearance) which may also result from conditions such as cardiovascular collapse (shock), acute myocardial infarction, and septicemia (see also WARNINGS and PRECAUTIONS).
The Estate admits the Glucophage® package insert clearly states that "the use of Glucophage® for any patient exhibiting signs of significant renal impairment, such as, creatinine level of 1.4 mg/dL or above," is "contraindicated" and that the package insert *863 complies with FDA regulations. But, the Estate contends the "contraindictions" section of the package insert fails to communicate that the risks of using Glucophage® clearly outweigh its benefits in patients with mild-to-moderate kidney dysfunction and should never be used with these patients.[12]
¶ 22 According to the FDA regulations, "contraindications" refers to "situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit." 21 C.F.R. § 201.57(d) (emphasis added). The Estate relies on the testimony of Dr. Wolff and Dr. Call to argue that in common medical practice physicians do not interpret "contraindications" as an absolute concept like the FDA; rather, contraindication is commonly understood as a relative concept, with gradations. Consequently, the Estate argues physicians would not interpret "contraindications" as listed in the Glucophage® warning label to mean the risks of using Glucophage® clearly outweigh any possible benefits to be expected from its use. Dr. Wolff testified:
I believe ... that physicians ... are generally not aware of the precise manner in which the FDA uses [contraindications] when it is used in a package insert and because of their failure to recognize how much greater the risk of lactic acidosis would be for patients who had one or more of the recognized contraindications.... [I]n my experience, most physicians never receive any training concerning FDA regulations and consequently have no idea about how the FDA views contraindications. I believe that most physicians interpret the word to include "relative" contraindications rather than "absolute" contraindications.[13]
Dr. Call also testified about his understanding of "contraindications":
We use the word "contraindication" at various levels. There are absolute contraindications, there are relative contraindications, and there are gradations, and there are clinical judgments. But in a general sense the word "contraindication" would be a reason not to use a medication.[14]
¶ 23 Additionally, the Estate contends that Dr. Call and Dr. Eschbach's continued use of Glucophage® with knowledge of LaMontagne's kidney dysfunction shows that neither doctor understood "contraindications" to mean that the risks clearly outweigh the benefits. But even if we assume that the Estate presented evidence of material issues of fact about whether the "contraindications" section alone adequately warned doctors of the risks associated with prescribing Glucophage®, the Estate fails to address the additional warnings in the other sections of the package insert. The Estate does not dispute that the additional warnings in the insert explicitly describe the circumstances that led to lactic acidosis in LaMontagne and that the repeated and additional warnings unmistakably warned doctors about the risks of using Glucophage® with a patient who has kidney dysfunction.
¶ 24 The package insert sets forth information under the following headings in the order listed: DESCRIPTION; CLINICAL PHARMACOLOGY; INDICATIONS AND USE; CONTRAINDICATIONS; WARNINGS; SPECIAL WARNING ON INCREASED RISK OF CARDIOVASCULAR MORTALITY; PRECAUTIONS; ADVERSE REACTIONS; DRUG ABUSE AND DEPENDENCE; OVERDOSAGE; and DOSAGE AND ADMINISTRATION.[15] The following sections address the risks associated with use of Glucophage® in patients with kidney dysfunction: CONTRAINDICATIONS; WARNINGS; PRECAUTIONS; and ADVERSE REACTIONS. These sections are listed below in relevant part, using the same type face as the actual insert.[16]

*864 CONTRAINDICATIONS:
GLUCOPHAGE is contraindicated in patients with:
1. Renal disease or renal dysfunction (e.g., as suggested by serum creatinine levels ≥ 1.5 mg/dL [males], ≥ 1.4 mg/dL [females] or abnormal creatinine clearance) which may also result from conditions such as cardiovascular collapse (shock), acute myocardial infarction, and septicemia (see also WARNINGS and PRECAUTIONS).
....
WARNINGS
Lactic Acidosis:
Lactic acidosis is a rare, but serious, metabolic complication that can occur due to metformin accumulation during treatment with GLUCOPHAGE; when it occurs, it is fatal in approximately 50% of cases....
The reported incidence of lactic acidosis in patients receiving metformin hydrochloride is very low (approximately 0.03 cases/1,000 patient-years, with approximately 0.015 fatal cases/1,000 patient-years). Reported cases have occurred primarily in diabetic patients with significant renal insufficiency, including both intrinsic renal disease and renal hypoperfusion, often in the setting of multiple concomitant medical/surgical problems and multiple concomitant medications. The risk of lactic acidosis increases with the degree of renal dysfunction and the patient's age. The risk of lactic acidosis may, therefore, be significantly decreased by regular monitoring of renal function in patients taking GLUCOPHAGE and by use of the minimum effective dose of GLUCOPHAGE.... (see also PRECAUTIONS).[17]
....
....
PRECAUTIONS
General:
Monitoring of renal functionGLUCOPHAGE (metformin hydrochloride tablets) is known to be substantially excreted by the kidney, and the risk of metformin accumulation and lactic acidosis increases with the degree of impairment of renal function. Thus, patients with serum creatinine levels above the upper limit of normal for their age should not receive GLUCOPHAGE. ...

Before initiation of GLUCOPHAGE therapy and at least annually thereafter, renal function should be assessed and verified as normal. In patients in whom development of renal dysfunction is anticipated, renal function should be assessed more frequently and GLUCOPHAGE discontinued if evidence of renal impairment is present.

....
ADVERSE REACTIONS
Lactic Acidosis: See WARNINGS, PRECAUTIONS and OVERDOSAGE Sections.[18]
¶ 25 The CONTRAINDICATIONS Section clearly states that the physician should also review the WARNINGS and PRECAUTIONS sections of the package insert. The insert not only warns of the general risks of lactic acidosis in patients with kidney dysfunction in the WARNINGS section, but in the PRECAUTIONS section the insert unequivocally states that "patients with serum creatinine levels above the upper limit of normal for their age should not receive GLUCOPHAGE"; that "[b]efore initiation of GLUCOPHAGE therapy and at least annually thereafter, renal function should be assessed and verified as normal"; and finally that "renal function should be assessed more frequently and GLUCOPHAGE discontinued if evidence of renal impairment is present."
¶ 26 Dr. Call and Dr. Eschbach testified that in January 1997 they knew LaMontagne's creatinine level at 2.3 mg/dL was well above normal. Despite the express warnings in the Glucophage® package insert that "lactic acidosis increases with the degree of impairment *865 of renal function" and that "renal function should be assessed and verified as normal" before beginning Glucophage® therapy, Dr. Call prescribed Glucophage® to LaMontagne because there were no other options to treat her diabetes. As a result, LaMontagne suffered the very injury that the package insert warned of, lactic acidosis.[19]
¶ 27 The explicit warnings in the Glucophage® package insert as a whole go beyond communicating that the risks clearly outweigh any possible benefitthe warnings instruct physicians that Glucophage® should not be used in patients with creatinine levels in the upper limit of normal. Whether physicians, like Dr. Call and Dr. Eschbach, choose to follow the warnings is a matter of medical judgment. See Terhune, 90 Wash.2d at 14, 577 P.2d 975; accord Adams v. Synthes Spine Co., 298 F.3d 1114 (9th Cir.2002).[20]

Failure to Provide Information on a Safety Surveillance Test
¶ 28 The Estate also asserts Dr. Wolff's testimony creates an inference that BMS was negligent in omitting information regarding the availability of a safety surveillance test in the package insert. BMS used a blood serum test, referred to as a safety surveillance test, to measure metformin levels in patients receiving Glucophage®. BMS used the test for private safety surveillance and research purposes only, and not for patient care. According to Dr. Wolff, BMS should have made its serum test available to physicians and informed physicians of availability of the test in its package insert.[21] But the Estate provides no legal or factual support for this argument and relies on a false assumption that the metformin test was available for clinical use.[22] As Dr. Wolff recognized in his declaration, BMS uses the test for private studies only and it is not currently available for clinical use.

CONCLUSION
¶ 29 We conclude, the BMS warnings in the Glucophage® package insert unequivocally warned doctors of the risks and were adequate as a matter of law. We affirm the trial court's decision to grant summary judgment and dismiss the Estate's product liability claims against BMS.[23]
WE CONCUR: COX, C.J., and BAKER, J.
NOTES
[1] The facts are not disputed.
[2] See Exhibit A to Steven Bass Declaration; National Institutes of Health, Medline Plus Medical Encyclopedia, at http://www.nlm.nih.gov/medlineplus/ ency/article/000500.htm# AlternativeNames.
[3] Clerk's Papers (CP) 48-49.
[4] CP at 52.
[5] CP at 53.
[6] CP at 59.
[7] CP at 60.
[8] CP at 60.
[9] Dr. Call and Dr. Eschbach settled with the Estate.
[10] Terhune, 90 Wash.2d at 14, 577 P.2d 975.
[11] LaMontagne does not provide any authority for requiring such a high standard for a manufacturer's warnings, which tends to contradict the duty and the reasoning in Terhune. See Terhune, 90 Wash.2d at 14, 577 P.2d 975. Reviewing courts are not required to address arguments that are not supported by authority. See Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992); State v. Johnson, 119 Wash.2d 167, 171, 829 P.2d 1082 (1992); RAP 10.3(a)(5).
[12] Brief of Appellant at 14, 16.
[13] CP at 198.
[14] CP at 176.
[15] See Exhibit A to Steven Bass Declaration. The Glucophage® package insert was also published verbatim in the Physician's Desk Reference.
[16] Because the insert exhibit is only a photocopy, it is difficult to determine whether some of the language has been bolded. Certain language has been italicized for emphasis.
[17] The WARNINGS section is actually enclosed in a box. This is referred to as a black-box warning and is used when specified by the FDA. See 21 C.F.R. § 201.57(e).
[18] Exhibit A to Steven Bass Declaration.
[19] Where the manufacturer warns of the injury the plaintiff suffered, other jurisdictions have found a manufacturer's warnings adequate as a matter of law. See, e.g., Anderson v. McNeilab, Inc., 831 F.2d 92, 93 (5th Cir.1987); Caveny v. Ciba-Geigy Corp., 818 F.Supp. 1404, 1406 (D.Col.1992); Cather v. Catheter Tech. Corp., 753 F.Supp. 634, 640 (S.D.Miss.1991); Bealer v. Hoffman-LaRoche, Inc., 729 F.Supp. 43, 45 (E.D.La.1990); Jones v. Lederle Labs., 695 F.Supp. 700, 708 (E.D.N.Y.1988); Upjohn Co. v. MacMurdo, 562 So.2d 680, 683 (Fla.1990).
[20] In Adams, the plaintiff was injured when a plate surgically implanted into his spine broke. Adams, 298 F.3d at 1118. The manufacturer of the surgically implanted Synthes Spine plate, recommended removal of the plate because the plate could breakthe precise harm that the plaintiff suffered. Id. at 1118. The court in Adams applied Washington law and decided the warnings were adequate as a matter of law because a reasonable jury could not reach any other conclusion. See id. at 1115-16, 1118. The fact that the physicians in Adams did not follow the manufacturer's recommendations did not show that they "couldn't or didn't read it and understand it, just that in their medical judgment, it wasn't wise to follow it." Id.
[21] CP at 201.
[22] Reviewing courts will not address issues not supported by authority. See Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992); State v. Johnson, 119 Wash.2d 167, 171, 829 P.2d 1082 (1992); RAP 10.3(a)(5).
[23] Because we conclude the Glucophage® package insert warnings were adequate as a matter of law, we do not need to address the proximate cause and statute of limitations arguments.